UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **JOHNNY DEAN, SR.** | * | **CIVIL ACTION** |
| **VERSUS** | * | **NO. 16-14254** |
| **SEA SUPPLY, INC. ET AL** | * | **SECTION "L"(3)** |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. FACTUAL AND PROCEDURAL HISTORY

This case arises out of injuries allegedly sustained by Plaintiff Johnny Dean, Sr. ("Plaintiff") on August 29, 2015 while he was employed as a captain on the M/V JESSICA ELIZABETH. Specifically, Plaintiff alleges that he slipped and fell in the engine room and sustained injuries to his shoulder, neck, and back.

On August 29, 2016, Plaintiff filed a complaint against Defendants Sea Supply, Inc., Sea Supply, Inc. COB, and the M/V JESSICA ELIZABETH ("Sea Supply"), the owner of the M/V JESSICA ELIZABETH, and Plaintiff's employer at the time of the accident. He seeks damages under the Jones Act, 46 U.S.C. § 30104, and general maritime law for Defendant's alleged negligence and vessel unseaworthiness. He also seeks maintenance and cure until he reaches maximum medical improvement. Defendant denies liability claiming that Plaintiff's injuries were caused in whole or in part by Plaintiff's own actions.

This matter came on for trial without a jury on June 26, 2018. The trial lasted three days. The Court has carefully considered the testimony of all of the witnesses, the exhibits entered into evidence during the trial, as well as the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law. To the extent that any findings of fact may be construed as conclusions of law, the Court hereby

1

adopts them as such. To the extent that any conclusions of law constitute findings of fact, the Court adopts them as such.

## II. FINDINGS OF FACT

(1)

Plaintiff Johnny Dean, Sr. is an individual of the age of majority and a resident of Louisiana.

(2)

Defendant Sea Supply is the owner and operator of the M/V JESSICA ELIZABETH, a 95-ton offshore supply vessel.

(3)

At all relevant times, Plaintiff was employed by Defendant Sea Supply, as a seaman or member of the crew of the M/V JESSICA ELIZABETH, in the capacity of captain. As a captain, Plaintiff was responsible for the operation of the vessel as well as managing the crew and the vessel's safety, including implementing and enforcing the safety rules.

(4)

The M/V JESSICA ELIZABETH has four engines. The engines are numbered 1-4 starting on the port side of the engine room. The No. 4 engine is located on the starboard side of the vessel against the vessel's gunwale. The engine room floor and stairs are made of aluminum diamond plate.

(5)

On August 29, 2015, Plaintiff was working the "night shift" – midnight to noon. When Plaintiff began his shift, the M/V JESSICA ELIZABETH was tied up to a platform in Ship Shoal 209-A located in the Gulf of Mexico off the coast of Louisiana; she had been tied up for the

night. Sometime around 6:30 a.m., the vessel began making runs in the field, transporting men and materials to the various rigs. Plaintiff noticed that the No. 4 engine was having trouble starting.

(6)

Plaintiff's deckhand during the night shift was Torris Bright. Bright went down to the engine room early in the morning of August 29, 2015 and tried to start the No. 4 engine. However, he could not get it to start. Plaintiff instructed him to start the other three engines and get ready for their runs that day. Plaintiff instructed Bright to try to start the No. 4 engine later in the morning as well, but it still would not start. At this point, Plaintiff decided to check on the No. 4 engine himself.

(7)

Later on that morning, Plaintiff went down to check on the No. 4 engine and attempted to start it himself but it would not start. Plaintiff testified that at this point he believed that the starter was jammed and that it would need to be replaced. Plaintiff returned to the wheelhouse and told Bright that they would change the starter after eating lunch.

(8)

Plaintiff testified that he went down to change the starter before Bright had finished eating lunch. Plaintiff gathered tools and began to work on the starter. Plaintiff testified that he gathered various wrenches and some absorbent pads which he intended to place on the bottom of the bilge so he could stand on them while working on the starter. He testified that there were cleaning rags in the rudder room but they were under other materials and not readily accessible. At this time, the vessel had returned to the vicinity of the platform waiting for the crew change and further instructions.

(9)

To reach the starter for the No. 4 engine, Plaintiff had to stand in the bilge. Plaintiff testified that the bilge was wet and oily so he placed some absorbent pads in the bilge to stand on. Notwithstanding the absorbent pads, Plaintiff got oil on the bottom of his shoes and was aware of it.

(10)

After finishing his lunch, Bright came down to the engine room to assist Plaintiff. Bright stood on the deck plating next to the No. 4 engine. Bright was not standing in the bilge with Plaintiff. Bright was wearing steel-toed, slip resistant shoes while working on the starter.

(11)

Plaintiff testified that the wrenches he had selected would not fit. He needed an additional or different tool to do the job.

(12)

Frustrated with his inability to change the starter and despite having Bright available to go get whatever tool was needed, Plaintiff got up from the bilge and hurried off toward the back of the engine room to get another tool from the rudder room where the tools were located. He testified that the walkway had some oil on it, which he knew about because it came from his shoes as he went back and forth over the course of checking on the engine earlier that morning.

(13)

As Plaintiff attempted to step up to go through the generator room on his way to the rudder room his foot slipped and he fell backwards landing hard on the steel deck of the engine room.

(14)

Bright was walking right behind the Plaintiff as he went to get the needed tool and witnessed his fall. Bright testified that he, Bright, had no trouble walking on the deck of the engine room and did not slip. Bright was wearing steel-toed, slip-resistant shoes.

(15)

At the time Plaintiff was working in the engine room, he was wearing tennis shoes. In fact, he was wearing the same tennis shoes when he entered the engine room earlier that morning when he initially tried to start the No. 4 engine.

(16)

The Sea Supply Safety Manual requires that "Safety toed shoes or boots with slip-resistant soles shall be worn at all times while outside the living quarters." As mentioned, at the time of the accident, Plaintiff was wearing a pair of Starter brand tennis shoes. These shoes were not in compliance with Sea Supply's safety requirements for working on the deck or in the engine room. Defense expert, Bob Borison, testified that the purpose of requiring slip-resistant shoes is to prevent falls and injuries when crewmembers are walking on wet or oily surfaces. There is no evidence to indicate that these tennis shoes had slip-resistant soles.

(17)

Plaintiff was the captain of the vessel and should have been aware of Sea Supply's safety regulations which required employees to wear steel-toed, slip-resistant shoes while working on deck and in the engine room. Additionally, as captain, Plaintiff was responsible for enforcing the safety regulations. Plaintiff was in violation of company safety policy and therefore negligent in not wearing the required shoes. Plaintiff testified that he customarily wore tennis shoes and that his company supervisor had seen him wearing tennis shoes during visits to the vessel. There is

no evidence, however, that he was seen wearing tennis shoes while working on the deck or in the engine room.

(18)

The Court finds that in addition to wearing improper shoes, Plaintiff also failed to properly prepare for the fact that he would get oil on his shoes while in the bilge to repair the starter. Plaintiff testified that he knew the bilge was dirty/oily and knew that he would need to stand in the bilge to repair the starter. Plaintiff knew that he had oil on his shoes when he stepped out of the bilge but failed to wipe off the oil using either an absorbent pad or rags, both of which were available to him. He also knew there was some oil on the walkway and failed to have it cleaned by either himself or the deckhand, Bright.

(19)

Plaintiff testified that the engine room floor was slippery because it had been painted with a primer paint. Plaintiff's expert, Captain Pierce, also testified that it was his opinion that the primer paint on the engine room floor made it slippery. In contrast, Defendant's expert, Bob Borison, testified that the paint on the engine room floor added to the slip-resistant quality of the diamond-plated flooring. The Court finds Defendant's expert is more credible.

(20)

Plaintiff testified that he was aware that the floor of the engine room could be slippery when it had oil on it, but he nevertheless chose to wear tennis shoes. Additionally, Plaintiff testified that he had a couple of "near misses" where he almost fell while walking through oil or degreaser on the engine room floor while wearing his tennis shoes.

(21)

The Court notes that the experts dispute whether the paint on the floor made it inherently dangerous. Additionally, Torris Bright walked directly behind Plaintiff at the time he fell and Bright did not slip or fall. The Court notes that Bright was wearing slip-resistant shoes. Accordingly, the Court finds that the paint on the floor was likely not an unseaworthy condition and even if it was, the paint on the floor was not the cause of Plaintiff's accident and injuries. Rather, the cause of Plaintiff's accident and injuries was the oil which accumulated on the bottom of his tennis shoes which he knew about before he left the bilge. These shoes were improper footwear and they were made more unsafe by his failure to wipe them off before proceeding to walk in the engine room. In short, the cause of Plaintiff's fall was his own negligent action or inaction.

Now, it is true that the No. 4 engine was not working properly and this created an unseaworthy condition but this was not the cause of Plaintiff's fall and resulting injuries. The sole cause of Plaintiff's fall was his failure to use proper footwear and failure to clean his shoes and the walking surfaces which he knew had oil on them and created a slippery condition.

(22)

Plaintiff has undergone significant medical treatment as a result of the accident. This treatment included three surgeries.

(23)

On April 21, 2017, Plaintiff had a cervical trans epidural steroid injection at C6/7. On August 25, 2017 Plaintiff had a lumbar discogram at L3-S1. On September 25, 2017, Plaintiff had a left shoulder arthroscopy and debridement of anterior and superior labrum with biceps tenotomy, bursectomy, subacromial decompression and debridement of partial articular rotator

cuff tear. On February 8, 2018, Plaintiff had a L3-4, L4-5, and L5-S1 posterior spinal fusion. On June 7, 2018, Plaintiff had C4-C7 anterior cervical discectomy and fusion with instrumentation and bonegraft.

(24)

Jimmy Martin, manager of Sea Supply, testified that Sea Supply initiated maintenance payments as of the date of incident and has continued these payments through the date of trial. Aside from the outstanding medical expenses submitted by Plaintiff at trial, the Court finds that Sea Supply continually and systematically paid all medical expenses and maintenance obligations up-through the date of trial.

(25)

At the time of his injury Plaintiff was 48 years old. Plaintiff left school at 16 years old and had reached the 5th grade; Plaintiff was in special education while in school. Plaintiff had an extensive maritime work history. He began working on boats at the age of 16 and started on shrimping boats before moving to offshore work where he was eventually promoted to captain. Plaintiff had been employed by Sea Supply for approximately fifteen years at the time of the accident. Plaintiff spend twelve of those years working on the M/V JESSICA ELIZABETH.

### III. CONCLUSIONS OF LAW

(1)

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty or maritime claims, and the Jones Act, 46 U.S.C. § 688. Venue is proper because the Defendants are subject to the personal jurisdiction of this Court.

(2)

Plaintiff has designated this matter as an Admiralty and Maritime claim within the meaning of Federal Rule of Civil Procedure 9(h), and as such, this matter is appropriately being tried to the bench as opposed to a jury.

(3)

The testimony presented clearly establishes that Johnny Dean, Sr. was a Jones Act seaman at the time of the August 29, 2015 accident. Defendant did not contest Plaintiff's status as a seaman at trial. The substantive law applied to this case is the Jones Act and general maritime law.

(4)

The matters before this Court include determination as to whether the vessel was unseaworthy under general maritime law, whether Defendant was negligent under the Jones Act, whether Plaintiff was contributorily negligent, the cause of Plaintiff's slip and fall, and the nature and extent of Plaintiff's injuries.

(5)

"To establish a claim for unseaworthiness, the injured seaman must prove that the owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it was intended to be used." *Boudreaux v. United States of America*, 280 F.3d 461, 468 (5th Cir. 2002) (*quoting Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm but a vessel reasonably suited for her intended service." *Boudoin v. Lykes Bros. S.S. Co.*, 348 U.S. 336, 339 (1955). "A vessel's condition of unseaworthiness might arise from any number of circumstances. Her gear might be defective, her appurtenances in disrepair,

her crew unfit. The number of men assigned to perform a shipboard task might be insufficient. The method of loading her cargo, or the manner of its stowage, might be improper." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499-500 (1971) (internal citations omitted); *see also Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976), cert. denied, 429 U.S. 1121 (1977). A vessel is unseaworthy when an unsafe method of work is used to perform vessel services. *Rogers v. Eagle Offshore Drilling Serv.*, 764 F.2d 300, 303 (5th Cir. 1985); *Burns v. Anchor-Wate Co.*, 469 F.2d 730 (5th Cir. 1972). The duty of the vessel owner to provide a seaworthy vessel is an absolute non-delegable duty.

(6)

To recover damages from an unseaworthy condition, the plaintiff is required to establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy. *Gavagan v. United States*, 955 F.2d 1016, 1020 (5th Cir. 1992) (*quoting Johnson v. Offshore Exp., Inc.*, 845 F.2d 1347, 1354 (5th Cir.1 988)) ("To establish the requisite proximate cause in an unseaworthiness claim, a plaintiff must prove that the unseaworthy condition played a substantial part in bringing about or actually causing the injury and that the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.").

(7)

Defendants had a non-delegable duty to provide Plaintiff with a safe place to work and provide seaworthy equipment on the vessel. The credible evidence supports the conclusion that the paint on the engine room floor did not create an unseaworthy condition. Plaintiff's fall and resulting injuries were caused by the Plaintiff's failure to use proper slip resistant shoes and failure to clean surfaces and shoes that he knew had oil on them.

(8)

"A ship's captain is master of his vessel in every sense of the word. He has broad authority and responsibility in the ship's successful operation." *Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 582 (5th Cir. 1986). "[The Captain also,] has . . . a special duty to take all reasonable steps consistent with safety to this ship and her crew, to avoid or minimize the chance of harm to others." *Boudoin v. J. Ray McDermott & Co.*, 281 F.2d 81, 85 (5th Cir. 1960).

(9)

Comparative negligence may apply to decrease the amount of a plaintiff seaman's recovery on a Jones Act claim for negligence. *Jauch v. Nautical Services, Inc.*, 470 F.3d 207, 213 (5th Cir. 2006). "A seaman's contributory negligence will not bar his recovery, but may reduce the amount of damages owed proportionate to his share of fault." *Id*. "The standard of care for a seaman under the Jones Act is to act as an ordinarily prudent seaman would act in similar circumstances." *Jackson*, 245 F.3d at 528; *Gautreaux*, 107 F.3d at 338-39; *see also Norfolk Southern Ry. Co. v. Sorrell*, 127 S.Ct. 799 (2007).

(10)

Having considered the testimony of the fact witnesses and expert witnesses presented by both sides, the Court has determined that Plaintiff violated the company's safety rule regarding proper footwear in the engine room and was therefore negligent.[1] Additionally, the Court finds that he was negligent in failing to properly prepare for his task and to clean his shoes after

---

[1] Company policy requires crew members to wear steel-toed, slip-resistant shoes.

exiting the bilge and to clean the walking surfaces before beginning the task.[2] The Court finds that these negligent acts were the sole cause of Plaintiff's accident and injuries.

(11)

A seaman is "obligated under the Jones Act to act with ordinary prudence under the circumstances," which circumstances take account of the seaman's "experience, training, [and] education." *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 Fed. App'x. 942, 947 (5th Cir. 2012) (*quoting Gautreaux v. Scurlock Marine, Inc*., 107 F.3d 331, 339 (5th Cir. 1997) (*en banc*)). However, "[w]here one is confronted through no fault of his own with a sudden emergency, his actions in extremis are not to be judged as they would be in ordinary circumstances." *Fruit Indus., Inc. v. Petty*, 268 F.2d 391, 394 (5th Cir. 1959). Here, all evidence supports the fact that Plaintiff was not faced with an emergency. All testimony suggests that the M/V JESSICA ELIZABETH was tied up to a platform at the time of the accident and likely had several hours before it would have to return to make additional personnel runs. Therefore, the Court finds that Plaintiff's actions in failing to properly prepare for the conditions he knew he was likely to encounter while fixing the starter were not reasonable under the circumstances. Accordingly, as a matter of law, the Court holds that Plaintiff is 100% as fault for his accident and injuries.

---

[2] The Court distinguishes the facts in this case from the facts in *Dunn v. Marquette Trans. Co., LLC*, 2017 WL 3887521 (E.D. La. Sept. 6, 2017) (Fallon, J.). There the Court found that the fact that Plaintiff was negligent in failing to wear the proper footwear was not the cause of his accident and injuries. *Id.* at *3. The Court noted that Plaintiff likely would have fallen even if he had been wearing the proper footwear because another crewmember wearing proper footwear also slipped. *Id.* Additionally, the Court noted that the Plaintiff was responding to an emergency situation. *Id.* at *10. In contrast, here, the other crewmember, Torris Bright, was wearing the proper footwear and did not fall while walking in the same location as Plaintiff. Additionally, the Court finds that Plaintiff Dean was not responding to an emergency situation when he fell.

(12)

A seaman injured in the course of his or her employment has a claim for maintenance and cure. Maintenance and cure is the implied right of the seaman arising from his or her employment relationship with the shipowner and is "independent of any other source of recovery for the seaman (e.g., recovery for Jones Act claims)." *Bertram v. Freeport McMoran, Inc.,* 35 F.3d 1008, 1013 (5th Cir. 1994). Thus, whether the seamen or employer was negligent is not at issue. *Brister v. AWI, Inc.,* 946 F.2d 350, 360 (5th Cir. 1991); *Jauch,* 470 F.3d at 212. Maintenance is the seaman's right to food and lodging and cure is the seaman's right to necessary and appropriate medical services, and both rights extend to the point at which the seaman reaches MMI. *See Breese v. AWI, Inc.,* 823 F.2d 100, 104 (5th Cir. 1987) (citing *Vaughan v. Atkinson,* 369 U.S. 527, 531 (1962)). Therefore, the maintenance and cure duty does not extend to treatment which is only palliative in nature and "results in no betterment in the claimant's condition." *Rashidi v. Am. President Lines,* 96 F.3d 124, 128 (5th Cir. 1996).

(13)

The evidence demonstrates that Sea Supply has paid maintenance and cure from the date of Plaintiff's injury until the date of trial. The credible evidence supports the conclusion that the Plaintiff sustained injuries to his shoulder, neck, and back on August 29, 2015 while working aboard the M/V JESSICA ELIZABETH and that he was unfit for duty as a result of this injury from that date until the time he is deemed to have achieved MMI. The weight of credible evidence indicates that Plaintiff has not yet reached MMI.

(14)

Defendant has paid all of Plaintiff's past medical bills which were submitted at the time of trial. Plaintiff submitted additional medical expenses on the day of trial. Therefore, Sea

Supply shall have 60 days to review the charges which Plaintiff recently submitted, and to reimburse Plaintiff for same.

(15)

Plaintiff will require continuing medical treatment made necessary by this fall in the service of the vessel. He is entitled to receive payment for these expenses as well as maintenance payments until he reaches maximum cure.

### IV.  CONCLUSION

Based on the above findings and conclusions,

**IT IS ORDERED** that judgment shall be entered in favor of Defendant Sea Supply, dismissing Plaintiff's claims for damages based on the Jones Act and general maritime law with prejudice.

However,

**IT IS FURTHER ORDERED** that Plaintiff is entitled to Maintenance and Cure until he reaches maximum cure.

Each party will bear their own costs.[3]

New Orleans, Louisiana, this 12th day of July, 2018.

*[signature]*
UNITED STATES DISTRICT JUDGE

---

[3] Ordinarily, the prevailing party is awarded costs. However, in this case each side has prevailed to some extent, *see Berg v. Wall St. Traders, Inc.*, 46 F.R.D. 47 (S.D.N.Y. 1968), moreover, the Court finds that this Plaintiff brought his claims in good faith and is in impecunious circumstances. *See Frischhertz, et al. v. Smithkline Beechan Corp., et al.*, 2013 WL 3894021, at *2-3 (E.D. La. July 26, 2013) (citing *Salley, et al. v. E.I. DuPont de Nemours & Co., et al.*, 966 F.2d 1011, 1017 (5th Cir. 1992)).